# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DEREK M. WILLIAMS,

        Plaintiff,

v.                                                          Case No. 18-C-1426

SCOTT ECKSTEIN, et al.,

        Defendants.

## DECISION AND ORDER

This case involves the increasingly common claim by a state prisoner against a correctional officer for failing to prevent him from harming himself in violation of the Eighth Amendment to the Constitution. It also involves the obverse claim that the efforts of the prison staff and officers to prevent him from harming himself further also amounts to a violation of the Eighth Amendment. Both claims reflect the extraordinary time, effort, and expense that prisons must devote to dealing with inmates who threaten self-harm, whether they are severely mentally ill, and thus not responsible for their conduct, or not.

On May 26, 2017, Plaintiff Derek M. Williams, an inmate currently incarcerated at Columbia Correctional Institution who is proceeding *pro se*, commenced this action under 42 U.S.C. § 1983 in the Western District of Wisconsin. At screening, Williams was allowed to proceed on Eighth Amendment claims against all defendants. Williams later amended his complaint, and, upon the defendants' motion and after briefing, the case was transferred to this court by order dated September 11, 2018. The court has subject matter jurisdiction under 28 U.S.C. § 1331. Presently

before the court are the parties' cross-motions for summary judgment. For the reasons stated below, Williams' motion will be denied and the defendants' motion will be granted in part.

## BACKGROUND

### A. Self-Harm on March 23–24, 2017

At all times relevant, Williams was an inmate housed at the Green Bay Correctional Institution (GBCI) in the Restrictive Housing Unit (RHU). The defendants were employees at GBCI: De Anna Stacy was a correctional officer; Andrew Wickman and James Elsinger were lieutenants; Jay Van Lanen was a captain; and Scott Eckstein was the warden. On March 23, 2017, Stacy, who began her employment at GBCI in October 2016, was working in RHU on third shift from 10:00 p.m. until 6:00 a.m. the next day. Stacy was assigned to supervise wing 500, as well as to monitor the inmates on observation status. Observation status is a restrictive status used for the purpose of preventing an inmate from inflicting harm upon himself or someone else. During the shift, Stacy was assigned to monitor three inmates on observation status, which meant that she would observe and record, both electronically and on written forms, each observation inmate's activities every fifteen minutes throughout the shift. These three observation inmates were housed in cells 212, 306, and 405, which are located in separate wings of RHU.

Williams was not on observation status at the beginning of Stacy's March 23rd shift, meaning he was not one of the inmates she was assigned to routinely monitor, though she conducted visual wellness checks of the inmates in the 500 wing, including Williams, who was in cell 504. At about 10:25 p.m., while Stacy was on her way to check on the observation inmates, Williams called Stacy to his cell and requested some paper bags. According to Williams, it was at this time he told Stacy: "I need to be placed on obs. (Observation Status) and I have all my property packed

up, get the Sgt. and bring me four more bags for the rest of my property." Williams Decl., Dkt No. 35 at ¶ 3. GBCI inmates Brandon McDuffie, Matthew Richard, and Kurtis Jones each attest that they heard Williams tell Stacy that he needed to be placed on observation status and that his property was packed. McDuffie, Richard, Jones Decls., Dkt. No. 35-1 at 18, 20, 22. Stacy admits that Williams requested some paper bags, but denies that he said he needed to be placed on observation status, that his property was packed, or that he provided a reason for requesting paper bags.

According to Williams, Stacy told him that she would finish her round and then notify the sergeant, but Stacy attests she told him only that she would drop off paper bags after her rounds. She claims that, as a regular practice, she informs a sergeant or supervisor when an inmate indicates thoughts of self-harm or requests observation placement. At the time of this initial encounter, Williams did not have a sharpened pen. At some point, Williams began sharpening a pen on the concrete floor of his cell and observed flashlights moving past his cell, although he was not able to identify the officers and did not attempt to communicate with them.

Stacy contends that later in the shift, she returned to Williams' cell with the paper bags he requested, but because it appeared that Williams was sleeping, she placed the bags in the mailbox attached to the wall outside his cell. According to Williams, he was not sleeping and, around 11:00 p.m., he told Stacy: "I need to go on obs. I'm having suicidal thoughts." Williams Decl., Dkt. No. 35 at ¶ 14. McDuffie and Richard both attest that they heard Williams yell to Stacy that he was having suicidal thoughts. Williams attests that Stacy said to give her some time. Stacy denies that Williams ever told her he was having suicidal thoughts. Again, Stacy believed Williams to be sleeping, so she left the bags in his mailbox and continued her duties of monitoring the inmates on

3

observation status. Around midnight, Williams informed an unidentified correctional officer that he told Stacy he was suicidal and needed to go on observation status. Richard recalls Williams telling the unidentified officer that he needed to be placed on observation.

Over the next several hours, Williams paced back and forth while other inmates, including McDuffie, Richard, and Jones, continued to call his name, but he did not respond. About four hours passed before Williams began harming himself. Sometime after 2:00 a.m. on March 24th, Richard and Jones pushed their emergency call buttons to ask staff to check on Williams, but no one responded. After some time had passed, sometime around 3:00 a.m., Richard and Jones began to yell and kick their cell doors to get the staff's attention because they continued to call to Williams but received no response. Shortly before 3:50 a.m., while performing observation checks, Stacy heard a loud banging noise in the 500 wing, which she investigated. She looked into Williams' cell and saw that he had punctured his right arm in the elbow crease and was bleeding. By that time, the cell floor was covered in blood. Stacy immediately contacted Sergeant Koeller, who took control of the situation. Williams was assessed by a health services unit (HSU) nurse and then taken to a hospital emergency room for treatment. Prior to March 23, 2017, Stacy had never spoken to Williams, and she was unaware that he had engaged in self-harm in the past.

**B. Restraint Placement from March 24–28, 2017**

Williams returned from the hospital around 6:30 a.m. on March 24th, at which time Van Lanen contacted Dr. Amy Zirbel, the on-call psychologist and Williams' assigned clinician, to discuss Williams' continued threat of self-harm. Van Lanen reported that Williams made threats to continue to engage in self-harm unless he was strapped down. Dr. Zirbel told Van Lanen to place Williams on constant observation status, which involves continuous line-of-sight monitoring by a

4

correctional officer. Van Lanen told Williams that he would be moving to a clinical observation cell, but Williams made threats to harm himself if he were placed in a cell. Van Lanen recontacted Dr. Zirbel and informed her of Williams' threats. Dr. Zirbel then determined Williams needed to be placed in mechanical restraints, which are authorized by Division of Adult Institutions (DAI) policy #500.70.10, to ensure his safety.

Williams was placed in restraints by security staff at approximately 7:05 a.m. on March 24th. A restraint bed, which uses five points of restraint with the inmate lying supine, is the primary method of restraint for clinical purposes. The initial time limit for placement in mechanical restraints is twelve hours, but that limit may be extended if an interview and examination of the inmate is conducted by a mental health clinician, medical staff, and a security supervisor, at least every twelve hours, and there are no mental health or medical recommendations against continued restraint. Additionally, the warden, a psychological services clinician, a nurse, and the DAI Administrator's designee must all sign off on the extension of the restraint placement.

According to Eckstein, if the restraint period is extended beyond twelve hours, the standard protocol at GBCI is to transfer the inmate to a restraint chair for a two-hour interval. This transfer is intended to get the inmate off his back, avoid joint stiffness, enhance blood circulation, implement range of motion activities, have the inmate evaluated by staff, allow the inmate to get food, water, and use the toilet, and ensure that the inmate had no contraband. The restraint chair is used on a temporary basis to change the inmate's position for the inmate's health. After two hours in a restraint chair, the inmate is transferred back to a restraint bed. While in restraints, mental health staff assess the inmate every twelve hours or more frequently if clinically necessary. HSU staff perform health assessments, circulation checks, and range of motion activities every four

hours, but every two hours if the inmate is in chair restraints. Security staff observe a restrained inmate in fifteen-minute intervals and record the activities of the inmate. Each of these assessments and observations are recorded on Department of Corrections (DOC) forms.

From the morning of March 24th until the morning of March 27th, GBCI staff carefully monitored Williams. A psychologist conducted restraint reviews every twelve hours, each time assessing whether Williams should remain in restraints. Every four hours, Health Services Staff performed medical assessments, allowed Williams to perform range of motion activities, and offered him Ensure nutritional supplement, water, and opportunities to use the bathroom. Every twelve hours, Williams was moved to the restraint chair for up to two hours. At various points over the course of this period, Williams continued to express threats of self-harm. At one point, around 7:05 p.m. on March 25th, after Dr. Zirbel recommended that Williams be transitioned to constant observation status, staff began to remove Williams' restraints. As soon as his right arm was freed, Williams bit at his wrist. Williams was again placed in restraints.

According to Williams, on March 25th at 7:30 a.m., Van Lanen woke him up and said, "time to get up, you're going back in the restraint chair, the Warden said he will break you until you're no longer suicidal." Williams Decl., Dkt. No. 35 at ¶ 46. Van Lanen denies making this statement, and Eckstein denies telling staff that the chair was to be used to "break" Williams and denies that the chair was used as a punitive measure. Williams attests that he told Van Lanen, "I don't want to go in the chair, it's too painful." *Id.* ¶ 50. Van Lanen followed Eckstein's order and placed Williams in the restraint chair. Van Lanen attests that at no time during Williams' placement in restraint from March 24 to 28 did he utilize the restraint chair to punish Williams for thoughts of self-harm or suicide or to "break him." Van Lanen Decl., Dkt. No. 49 at ¶ 22. Williams disagrees

6

and attests that, at one point, Van Lanen threatened to use his stun gun on Williams if he were noncompliant.

On March 26th around 7:45 p.m., after Elsinger informed him he was to be placed in the restraint chair again, Williams asked Elsinger, "why do you keep doing this to me, I'm not causing problems." Williams Decl., Dkt. No. 35 at ¶ 58. Elsinger responded, "we're going to break you so you'll never feel suicidal again." *Id.* Williams was then placed in the restraint chair. Although defendants generally deny that Elsinger made this statement, they do not cite a declaration from Elsinger. *See* Defs.' Resp. to Pl.'s Proposed Findings of Fact, Dkt. No. 44 at ¶ 58.

In the morning of March 27th, Van Lanen woke up Williams and informed him that he was going in the restraint chair. Williams told Van Lanen that he was having chest pains, felt dizzy, and did not want to be placed in the restraint chair. Van Lanen responded that Williams was going in the chair per Eckstein's order. Williams was placed in the restraint chair. Around 8:00 a.m. the same morning, Williams was stood up to allow a nurse to check his blood pressure after he complained of chest pain. Williams was either unable or refused to remain standing and was brought to the ground. Williams claims he had a seizure. Williams was taken by ambulance to a hospital emergency room, where a physician performed a cardiac workup, including an EKG, CXR, and labs. All tests were normal. Williams was diagnosed with musculoskeletal chest wall pain and the physician recommended Ibuprofen for the pain.

Williams arrived back at GBCI at 12:50 p.m. on March 27th and, after an assessment by psychologist Dr. Harris-Forbes, was placed into restraints. Ten minutes later, around 1:00 p.m., Eckstein entered Williams' cell to check on him. According to Williams, Eckstein stated, "you will come to your senses soon enough, my staff get paid to do what they do and starting tomorrow you'll

7

be in the chair for four hours instead of two." Williams Decl., Dkt. No. 35 at ¶ 66. Eckstein denies making this statement and instead attests that he spoke with Williams to encourage him to move from restraints to clinical observation status. GBCI staff then resumed their normal restraint procedures. Later the same day, around 6:50 p.m., Williams told Lieutenant Cushing that his thoughts of self-harm were starting to go away.

The next day, March 28th, at around 12:05 a.m., Van Lanen woke up Williams and told him he would be moved to the restraint chair. Williams told Van Lanen, "just let me be, I'm going to come off this tomorrow, just let me get my mind right." *Id.* ¶ 68. Van Lanen responded, "you known the routine, these are the Warden's orders." *Id.* Williams was placed in the restraint chair. At 2:20 a.m., Williams was removed from the restraint chair and placed in bed restraints. At 10:15 a.m. that morning, Williams was released from restraints, given a shower, and then placed in clinical observation status.

Williams commenced this action against the defendants on May 26, 2017, seeking damages of a half million dollars for the alleged violation of his Eighth Amendment rights. He claims that Stacy was deliberately indifferent to his substantial risk of suicide and that Eckstein, Van Lanen, Wickman, and Elsinger inflicted unnecessary pain and suffering upon him by their placing him in a restraint chair for two hours every twelve-hour interval.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the

8

case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: a court construes facts and inferences arising from them in favor of the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). When cross-motions for summary judgment are filed, "[i]n effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery." *Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 741 (7th Cir. 2003). "The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). "If there is no triable issue of fact on even one essential element of the non-movant's case, summary judgment is appropriate." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**ANALYSIS**

Williams was allowed to proceed on three Eighth Amendment claims under 42 U.S.C. § 1983: (1) a failure to protect claim against Stacy for her alleged failure to place Williams on observation status on March 23, 2017; (2) cruel and unusual punishment claims against Eckstein, Van Lanen, Wickman, and Elsinger for transferring Williams from bed restraints to chair restraints for two hours every twelve hours between March 24 and 28, 2017; and (3) a deliberate indifference claim against Van Lanen for his alleged overriding of a medical order for a bed wedge and regular

meal during his placement in restraints. Williams has waived claim number three, so the court does not address it here. *See* Dkt. No. 52 at 2. The court will examine his remaining two claims.

**A. Failure to Protect From Self-Harm**

First, Williams claims that Stacy failed to protect him from an objectively serious risk of harm to his future health or safety. "Section 1983 imposes liability when a defendant acts under color of state law and violates a plaintiff's rights under the Constitution or laws of the United States." *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014) (citing 42 U.S.C. § 1983). Here, there is no dispute that the defendants were acting under color of state law at all times relevant. The central dispute is whether their conduct amounts to the deprivation of a constitutional right.

Prison officers and staff can violate an inmate's Eighth Amendment rights either directly by intentionally inflicting what amounts to cruel and unusual punishment, *Hudson v. McMillian*, 503 U.S. 1 (1992), or indirectly by their deliberate indifference to a serious risk to the inmate's safety. Risks to an inmate's safety include those posed by other violent inmates, *Farmer v. Brennan*, 511 U.S. 825 (1994), as well as those posed by conditions over which an inmate has no control, such as serious medical conditions. *Estelle v. Gamble*, 427 U.S. 97 (1976). Deliberate indifference to the risk of suicide or self-harm that an inmate poses to himself, whether or not due to severe mental illness, has also been held to violate the Eighth Amendment. *See, e.g.*, *Boncher ex rel. Boncher v. Brown Cty.*, 272 F.3d 484, 486 (7th Cir. 2001); *Miranda v. Lake Cty.*, 900 F.3d 335, 349 (7th Cir. 2018).

"A § 1983 claim based upon a violation of the Eighth Amendment through deliberate indifference to inmate safety has both an objective and a subjective element: (1) the harm that befell

the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Farmer*, 511 U.S. at 832).

The first prong is automatically satisfied here because suicide or attempted suicide is objectively serious and poses a substantial risk to Williams' health. *See Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001); *see also Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999). "Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins*, 462 F.3d at 761 (citing *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)). As to the first showing, "the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Id.* (citations omitted). A risk of future harm must be "sure or very likely" to give rise to "sufficiently imminent dangers" before an official can be liable for ignoring that risk. *See Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion) (emphasis omitted); *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). As to the second showing, the defendant must show "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Id.* at 762 (citing *Duane v. Lane*, 959 F.3d 673, 676 (7th Cir. 1992)).

Williams has submitted sworn declarations from himself and other inmates that he told Stacy in an initial encounter on March 23rd that he needed to be placed on observation status and had his property packed and that, in a second encounter the same night, he told Stacy that he needed to go

11

on observation status and that he was having suicidal thoughts. In her own declaration, Stacy denies that Williams made such statements, thereby creating a dispute of fact. The defendants deny that this factual dispute precludes judgment in Stacy's favor. They contend that, even accepting Williams' version that he directly told Stacy that he needed to be placed on observation and was having suicidal thoughts, he has not presented evidence that Stacy was aware that the threat of suicide was imminent.

As to the first encounter, it is undisputed that Williams requested paper bags. Even accepting as true Williams' statements that he requested to go on observation status and told Stacy that he needed the bags for the rest of his property, this is not enough to show that serious injury to Williams was imminent. In fact, it suggests just the opposite. Williams was aware that Stacy would require time to retrieve the bags and that he would then need to place the rest of his belongings in the bags. Having received a request for paper bags, it was reasonable for Stacy to believe that, were Williams an imminent risk of suicide, he would not have requested the paper bags so he could pack his belongings. If the threat of suicide was imminent, Williams would have said or done something more upon being told by Stacy that she would be back after completing her rounds. *See Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 777 (7th Cir. 2014) (noting "a request to see a psychiatric crisis counselor does not, standing alone, put a prison officer on notice of the imminent possibility of suicide"). Based on this evidence, no reasonable jury could find that, during the initial encounter, Stacy was aware of an imminent risk that Williams would attempt suicide.

What differentiates the second encounter from the first is that Williams attests that he directly told Stacy that he was having suicidal thoughts. McDuffie and Richard corroborate this statement, and Richard contends Williams' voice sounded distressed. He claims that he and several

12

other inmates yelled for Stacy to notify the sergeant. Stacy, for her part, denies that Williams made such a statement; instead, she reports that Williams appeared to be sleeping. Stacy states that if Williams had told her he was intending to kill himself and needed to go to observation, she would have immediately notified a sergeant or supervisor, Stacy Decl., Dkt. No. 47, ¶ 21, implicitly conceding that if Williams' version of events is true, action on her part was required. Defendants argue that Stacy had no reason to believe that Williams had anything he could use to harm himself, but as Williams points out, Stacy knew he was in restricted housing and had in his cell personal property which included items that could be used to harm himself. Dkt. No. 55 at 7.

Assuming Williams' version of events is true, which I must do in deciding Stacy's motion to dismiss, the facts of this case stand in contrast to those of *Collins v. Seeman.* In *Collins*, the inmate told a correctional officer that he wanted to see the prison crisis counselor because he was feeling suicidal. Approximately fifty-five minutes later, the inmate hung himself with his bed sheet. The estate of the inmate then sued the correctional officer alleging deliberate indifference in violation of the deceased inmate's Eighth Amendment rights. In affirming the district court's summary judgment in favor of the correctional officer, the court noted that the evidence demonstrated that when told by the inmate that he was feeling suicidal, the defendant officer immediately informed the control room. Upon relaying the request, the officer then did not take up other duties or sit idle, but returned to the plaintiff's cell and informed him that the counselor had been called and would be there as soon as possible. The officer then received assurance from the inmate that he would be all right and could wait until the counselor arrived. At some point within the next fifteen to twenty minutes, the officer returned to the inmate's cell a third time to make certain that nothing was wrong. Shortly thereafter the inmate hung himself. 462 F.3d at 759, 762.

Unlike the defendant in *Collins*, Stacy did nothing to determine whether Williams was serious about feeling suicidal or to mitigate the risk. Nor is this case like *Davis-Clair v. Turck*, where the plaintiff told a social worker that if he was transferred to another prison he would likely commit suicide. 714 F. App'x 605 (7th Cir. 2018). There the court held that a remark to a social worker that he would attempt suicide at some unspecified time after his transfer does not convey an imminent risk. *Id.* at 606. If, as Stacy asserts, Williams never mentioned suicide to her, then her actions could not be considered deliberately indifferent to a known risk. Even if Williams did tell her he needed to go to observation because he was having suicidal thoughts, a jury could conclude that any risk was not imminent. It was undisputed in *Collins*, for example, that "inmates often request meetings with crisis counselors for reasons both serious and mundane, and sometimes make such requests as a means of manipulating prison staff." *Id.* at 761. The same may be true of inmates reporting "suicidal thoughts." But the evidence that Williams was distressed and did make such a statement is enough to get to a jury under current case law. And since it is well established that deliberate indifference to an imminent threat of suicide constitutes a violation of the Eighth Amendment, good faith immunity does not apply. Stacy's motion for summary judgment must therefore be denied.

**B. Placement in Restraint Chair**

Williams' claim about restraint placement from March 24 to 28, 2017, concerns his placement in the restraint chair after his return from the hospital. Specifically, Williams claims that Eckstein, Van Lanen, Wickman, and Elsinger wantonly inflicted unnecessary pain on him when they rotated him to the restraint chair for two hours at a time after every twelve hours of bed restraints. "[T]he Eighth Amendment prohibits punishments which, although not physically barbarous,

14

'involve the unnecessary and wanton infliction of pain' or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citations omitted). Punishment involves the unnecessary and wanton infliction of pain when it is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 182–83 (1976). Conditions of confinement will be found to violate the Eighth Amendment when they "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347.

To establish that a prison official violated the Eighth Amendment, a plaintiff must make two showings. First, "the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (citations omitted). Second, the prison official "must have a 'sufficiently culpable state of mind.' In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (citations omitted). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

This case presents a situation in which the inmate's own conduct was the principal motivating factor in the imposition of the conditions that comprised the inmate's complaint. The court "cannot evaluate prison conditions in a vacuum" and must account for the facts specific to each case. *See Bowers v. Pollard*, 345 F. App'x 191, 197 (7th Cir. 2009); *see also Gillis v. Litscher*, 468 F.3d 488, 492–93 (7th Cir. 2006) (noting that evaluation of conditions of confinement claims is a fact-intensive inquiry). As this court noted in *Bowers*, "when a prison is facing a recalcitrant

15

and uncontrollable inmate, it has a freer hand to take steps to impose discipline and ensure the inmate's own safety without running afoul of the Eighth Amendment. What may be considered cruel and unusual in one case may be acceptable in another, so long as the conditions imposed have some legitimate coercive and penological purpose and are linked to correcting the behavior in question." 602 F. Supp. 2d 977, 989 (E.D. Wis. 2009).

Williams does not dispute that the defendants were justified in placing him in restraints upon his return from the hospital at approximately 6:30 a.m. on March 24, 2017. Dr. Zirbel, the on-call psychologist, initially ordered that he be placed in an observation cell with continuous direct observation. But when told that Williams threatened to harm himself if placed in a cell, she ordered that he be placed in restraints. Williams, himself, claims he "had to plead with Van Lanen to be placed in bed restraints, as plaintiff knew his mental health state was too far gone with thoughts of suicide." Dkt. No. 56 at ¶¶ 47, 49. And he was continued in restraints until the morning of March 28, 2017. At 6:50 p.m. on March 27, Williams told Lieutenant Cushing his thoughts of self-harm were starting to go away. *Id.* at ¶ 151. At 1:00 a.m. on March 28, he told Dr. Hamilton that he hoped to come out of restraints the next day. Williams was polite and talkative. He did not indicate that he had intentions to continue self-harm but said he did not feel comfortable to be removed from restraints yet. Williams seemed very tired and he wanted to sleep on his thoughts and discuss his removal in the morning. Hamilton continued Williams' restraint placement for his safety. *Id.* at ¶ 156. Finally, at 10:15 a.m. on March 28, Williams was released from restraints, given a shower, and placed in clinical observation status. *Id.* at ¶¶ 161–62.

Williams argues that his placement in a restraint chair for two hours every twelve hours denied him the minimal civilized measure of life's necessities and that Eckstein, Van Lanen,

16

Wickman, and Elsinger used the chair as a means to wantonly inflict pain on him. Williams alleges that his placement in the restraint chair, with his hands cuffed behind his back, "caused nonstop pain over the next two hours." Williams Decl., Dkt. No. 35 at ¶ 44. He also attests that he told Van Lanen and Wickman that he did not want to go in the chair, asked Elsinger why he kept being put in the chair, and told Van Lanen that the chair was too painful.

Williams does not meaningfully dispute that GBCI, as a practice, rotates a restrained inmate from bed restraints to a restraint chair after twelve hours for the inmate's own health, and that he was so rotated from March 24 through March 28, 2017 for his own health and not for punishment. As to Eckstein, Williams attests that around 1:00 p.m. on March 27, 2017, shortly after returning from the hospital for musculoskeletal pain, Eckstein told him that he would come to his senses and that he would be placed in the restraint chair for four hours instead of two starting on March 28th. He also attests that Van Lanen told him that Eckstein said he would break him until he was no longer suicidal. Eckstein denies making these statements. Eckstein insists that, in fact, inmates are rotated to the restraint chair after twelve hours in bed restraints to get the inmate off his back, to avoid joint stiffness, to enhance blood circulation, and to allow for food, water, bathroom, and range of motion during the transfer. GBCI nurse Cassandra Baier attests that such a change in position is advantageous from a medical perspective.

Williams' claim that the use of the restraint chair constituted cruel and unusual punishment is belied by the video recording submitted in support of the defendants' motion. Dkt. No. 50. While the video recording does not cover the entire four days he was restrained, it does show Williams being placed into the restraint chair with his hands behind his back. Exhibit 1014. Straps across his chest, lap, and legs restrain him in an upright sitting position on the chair where he was

17

kept for two hours before being returned to the bed. Williams shows no signs of distress and voices no complaint to the officers as he is strapped into the chair. The constant monitoring by security staff and the health checks performed by the health services staff every two hours likewise belie his assertion that the defendants were attempting to cause injury or were deliberately indifferent to his condition. When one considers the number of correctional officers and members of the health and psychological services staff involved in Williams' care and treatment over the four days he was in restraints, the suggestion that the defendants were indifferent or sought to inflict wanton injury on him borders on the ludicrous.

Williams' claims that Eckstein and Elsinger made statements suggesting an intent to dissuade him from continuing to engage in self-destructive behavior does not change the fact that restraining him to a chair for a two-hour period after twelve hours of lying on his back was necessary to protect him from serious health consequences. As Nurse Baier explained, a change of position for an inmate placed in restraint for a prolonged period is important for preventing the formation of bed sores or blood clots, and avoiding deep vein thrombosis or other circulation and respiratory issues that could arise from an inmate laying on his back for longer than 12 hours. *See* Baier Decl., Dkt. No. 48 at ¶ 13. Williams objects to consideration of Nurse Baier's medical opinion on the ground she was not disclosed as an expert as required by Fed. R. Civ. P. 26(a)(2). But Rule 26(a)(2) applies only to experts who are retained to offer an opinion. Nurse Baier, like Dr. Zirbel, was a treating professional either employed by or under contract with the Department of Corrections offering factual information within her personal knowledge. Rule 26(a)(2) therefore does not apply. Even if it did, the rule requires disclosure 90 days before trial or at a time ordered by the court. No trial date has been set, and thus no prior disclosure under Rule 26 was required.

As for the fact that Williams' hands were handcuffed behind his back, this too was necessary to ensure his safety. Williams continued to threaten to rip out the stitches that closed the puncture wound in his arm, and when guards did begin to remove the restraints after the first day, he tried to bite his wrist. Given his behavior, it would have been dangerous to remove restraints from his hands or place them in front where he would be able to reach his arms with his teeth. Williams notes that the instructions for the restraint chair carry a caution that "handcuffs and leg irons must be removed as soon as possible to prevent injury." Dkt. No. 35-1 at 44. Yet he points to no injury he suffered as a result of being handcuffed and in leg irons while in the restraint chair. Dr. Zirbel, who was assigned as Williams' primary psychiatric clinician, notes that at no time did Williams report to her that security staff utilized the restraint chair as punishment, nor that the security staff threatened to use the restraint chair as punishment or to "break" him. Dr. Zirbel also noted that it appeared that the use of the restraint chair was a respite from the 12-hour period in the restraint bed because Williams was able to change position, stand, engage in range of motion activities, and the like. Dkt. No. 46 at ¶¶ 37, 38.

In sum, although the restraint chair may have been uncomfortable, no reasonable jury could find from the evidence submitted that its use under the circumstances constituted cruel and unusual punishment within the meaning of the Eighth Amendment. Williams never complained about pain or discomfort resulting from placement in the chair to the psychologists who saw him or to the nurses who assessed him. Nor does the video in the record show Williams complaining about placement in the restraint chair or displaying any signs of distress while in the chair. Williams was routinely monitored by HSU staff, including psychologists, regularly offered Ensure, water, and bathroom breaks, received range of motion activities, and was allowed to walk around. Providing

this attention required a significant amount of staffing resources at GBCI, including contribution from several correctional officers, supervising officers, nurses, psychologists, and the warden. In light of this evidence, no reasonable factfinder could conclude that Williams' temporary placement in the restraint chair constituted a "gratuitous infliction of suffering" that denied him "the minimal civilized measure of life's necessities." *See Rhodes*, 452 U.S. at 347; *Gregg*, 428 U.S. at 182–83. Summary judgment in favor of the remaining defendants will therefore be granted.

## CONCLUSION

For the reasons stated herein, Williams' motion for summary judgment (Dkt. No. 32) is **DENIED**, the defendants' motion for summary judgment (Dkt. No. 42) is **DENIED** as to defendant Stacy, but **GRANTED** as to the remaining defendants. The clerk is directed to place this matter on the court's calendar for further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this  9th  day of September, 2019.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court