UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEREK M. WILLIAMS,

    Plaintiff,

    v.                         Case No. 18-C-1426

DE ANNA STACY,

    Defendant.

## DECISION AND ORDER

Plaintiff Derek M. Williams filed this action under 42 U.S.C. § 1983, alleging that his civil rights were violated. Williams was permitted to proceed on a failure to protect claim against De Anna Stacy based on his allegations that she failed to respond to his threats of self-harm; cruel and unusual punishment claims against Scott Eckstein, Jay Van Lanen, Andrew Wickman, and James Elsinger for transferring him from bed restraints to chair restraints for two hours every twelve hours between March 24 and 28, 2017; and a deliberate indifference claim against Van Lanen for his alleged overriding of a medical order for a bed wedge and regular meal during his placement in restraints. On September 9, 2019, the court granted Defendants' motion for summary judgment with respect to the claims against Eckstein, Van Lanen, Wickman, and Elsinger but denied the motion as to the failure to protect claim against Stacy. Although the matter was scheduled for trial to begin on October 26, 2020, the court adjourned the trial in light of concerns related to the COVID-19 pandemic on October 14, 2020. The court has decided to reconsider, *sua sponte*, its earlier decision denying-in-part Defendants' motion for summary

judgment. Upon further consideration, the court grants Defendants' motion for summary judgment in its entirety and dismisses the case.

The court previously summarized the background facts of this case in its September 9, 2019 order:

> At approximately 10:25 p.m., while Stacy was on her way to check on [inmates in the observation unit], Williams called Stacy to his cell and requested some paper bags. According to Williams, it was at this time he told Stacy, "I need to be placed on obs. (Observation Status) and I have all my property packed up, get the Sgt. and bring me four more bags for the rest of my property." Williams Decl., Dkt. No. 35 at ¶ 3. GBCI inmates Brandon McDuffie, Matthew Richard, and Kurtis Jones each attest that they heard Williams tell Stacy that he needed to be placed on observation status and that his property was packed. McDuffie, Richard, Jones Decls., Dkt. No. 35-1 at 18, 20, 22. Stacy admits that Williams requested some paper bags, but denies that he said he needed to be placed on observation status, that his property was packed, or that he provided a reason for requesting paper bags.
>
> According to Williams, Stacy told him that she would finish her round and then notify the sergeant, but Stacy attests she told him only that she would drop off paper bags after her rounds. She claims that, as a regular practice, she informs a sergeant or supervisor when an inmate indicates thoughts of self-harm or requests observation placement. At the time of this initial encounter, Williams did not have a sharpened pen. At some point, Williams began sharpening a pen on the concrete floor of his cell and observed flashlights moving past his cell, although he was not able to identify the officers and did not attempt to communicate with them.
>
> Stacy contends that later in the shift, she returned to Williams' cell with the paper bags he requested, but because it appeared that Williams was sleeping, she placed the bags in the mailbox attached to the wall outside his cell. According to Williams, he was not sleeping and, around 11:00 p.m., he told Stacy: "I need to go on obs. I'm having suicidal thoughts." Williams Decl., Dkt. No. 35 at ¶ 14. McDuffie and Richard both attest that they heard Williams yell to Stacy that he was having suicidal thoughts. Williams attests that Stacy said to give her some time. Stacy denies that Williams ever told her he was having suicidal thoughts. Again, Stacy believed Williams to be sleeping, so she left the bags in his mailbox and continued her duties of monitoring the inmates on observation status. Around midnight, Williams informed an unidentified correctional officer that he told Stacy he was suicidal and needed to go on observation status. Richard recalls Williams telling the unidentified officer that he needed to be placed on observation.
>
> Over the next several hours, Williams paced back and forth while other inmates, including McDuffie, Richard, and Jones, continued to call his name, but he did not respond. About four hours passed before Williams began harming himself.

2

> Sometime after 2:00 a.m. on March 24th, Richard and Jones pushed their emergency call buttons to ask staff to check on Williams, but no one responded. After some time had passed, sometime around 3:00 a.m., Richard and Jones began to yell and kick their cell doors to get the staff's attention because they continued to call to Williams but received no response. Shortly before 3:50 a.m., while performing observation checks, Stacy heard a loud banging noise in the 500 wing, which she investigated. She looked into Williams' cell and saw that he had punctured his right arm in the elbow crease and was bleeding. By that time, the cell floor was covered in blood. Stacy immediately contacted Sergeant Koeller, who took control of the situation. Williams was assessed by a health services unit (HSU) nurse and then taken to a hospital emergency room for treatment. Prior to March 23, 2017, Stacy had never spoken to Williams, and she was unaware that he had engaged in self-harm in the past.

Dkt. No. 65 at 2–4.

Williams claims Stacy violated the Eighth Amendment by failing to respond to his threats of self-harm. His claim is predicated on the principle adopted by the Supreme Court in *Estelle v. Gamble* that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted). To establish deliberate indifference in a case where the risk to an inmate's health and safety is a suicide, attempted suicide, or other act of self-harm, the plaintiff must show that the defendant "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (citing *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)). In other words, "[a]n official must be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and the official 'must also draw the inference.'" *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 776 (7th Cir. 2014) (quoting *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999)). While prison staff are under an obligation to protect inmates from self-harm, *Taylor v. Wausau Underwriters Insurance Co.*, 423 F. Supp. 2d 882, 889 (E.D. Wis. 2006), "[a] risk of future harm

must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)).

The parties dispute whether Williams told Stacy of his intent to commit self-harm. Even if Williams did notify Stacy of his intent, the court finds that Williams has not established that Stacy recklessly disregarded a significant risk of imminent harm or was aware of facts from which she could infer that a substantial risk of harm existed. With respect to the parties' first encounter where Williams asserts he requested to go on observation status and asked Stacy for more paper bags to pack his property, as the court previously explained, Williams' statement to Stacy is not enough to show that a serious injury to Williams was imminent. If the threat of suicide was imminent, Williams would have said or done something more upon being told by Stacy that she would be back after completing her rounds. *See* Dkt. No. 65 at 12.

As to the second encounter, where Williams asserts that he told Stacy he was having suicidal thoughts, a reasonable jury could not find that Stacy knew that a substantial risk of suicide existed, as this statement "lacked any indication that [Williams] may have 'imminently' sought to have harmed himself." *Johnson v. Garant*, 786 F. App'x 609, 610 (7th Cir. 2019) (quoting *Collins*, 462 F.3d at 761). To meet this standard, a prisoner must do "more than tell guards that he planned to commit suicide." *Id.* There is nothing in the record to suggest that Williams would imminently attempt to harm himself. Williams does not dispute that Stacy had no knowledge of his previous acts of self-harm or the fact that he had a sharpened pen. Instead, he asserts that Stacy knew he had personal property in his cell, which included items that could be used to harm himself. But "[t]he presence of common items in his cell . . . does not change the analysis." *Id.* There is no basis to infer that Stacy knew Williams had the means to harm himself or that the risk of future

4

harm was sure or very likely. Absent a showing that Stacy knew of an obvious risk that Williams would harm himself with a sharpened pen but ignored that risk, Williams' claim fails as a matter of law. Summary judgment will therefore be granted in favor of Stacy.

For these reasons, the court **VACATES** its previous decision partially granting Defendants' motion for summary judgment and hereby **GRANTS** said motion in full. This case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 16th day of October, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
